## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| BRANDIE KEEGAN, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> SALESLOFT, INC.; and APPFOLIO, INC., <br><br> Defendants. | Case No.: _____ <br><br> **CLASS ACTION** <br><br> **DEMAND FOR A JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Brandie Keegan ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this action against Defendants Salesloft, Inc. ("Salesloft") and AppFolio, Inc. ("AppFolio") (collectively, "Defendants"), alleging as follows.

## I. INTRODUCTION

1.     This class action arises from Defendants' failure to properly secure and safeguard Plaintiff's and over 72,000 Class Members' sensitive personally identifiable information (PII"), from being stolen by cybercriminals in a foreseeable, preventable data breach.

2.     Between August 18 and August 22, 2025, criminal hackers accessed Salesloft's server and stole Plaintiff's and Class Members' PII stored therein,

including their full names, dates of birth, addresses, and Social Security numbers, (collectively, "Private Information"), causing widespread injuries to Plaintiff and Class Members (the "Data Breach").

3.     Salesloft is a software as a service ("SaaS") company that provides a variety of software products by subscription to its corporate clients, including the Drift Platform, Salesloft's integrated AI-powered "revenue orchestration" platform with AI chatbot engagement, sales automation, customer data processing and analytics, buyer and prospect insight, and workflow integration functions.

4.     AppFolio is a SaaS company that provides a cloud-based software platform by subscription to its real estate industry clients, with AI-driven functions including accounting, tenant screening, leasing and maintenance, tenant communication, data processing and analysis, and business insight. AppFolio is a client of Salesloft and at all relevant times, subscribed to and used Salesloft's Drift Platform for customer relationship management functions.

5.     Plaintiff and Class Members are consumers who transacted with AppFolio's real estate industry customers. As a condition of transacting with AppFolio's customers, Plaintiff and Class Members were required to entrust their sensitive, non-public Private Information to AppFolio, and through AppFolio, to Salesloft.

6.      Defendants could not perform their operations or provide the services they do without collecting and using Plaintiff's and Class Members' Private Information, and retain it for many years, at least, even long after Plaintiff's and Class Members' transactions with Appollo's real estate industry customers.

7.      Defendants could not operate their respective businesses without collecting Plaintiff's and Class Members Private Information and indeed, generates their respective revenue from software platforms meant specifically to manage, use, analyze, and profit from customer PII.

8.      As technology and SaaS companies that handle consumers' Private Information, Defendants owe the individuals to whom the information relates a duty to adopt reasonable measures to protect it from disclosure to unauthorized third parties, and to keep it safe and confidential. This duty arises under contract, statutory and common law, industry standards, representations made to Plaintiff and Class Members, and because it is foreseeable that the exposure of Private Information to unauthorized persons—and especially hackers with nefarious intentions—will harm the affected individuals, including but not limited to the invasion of their private health and financial matters.

9.      Defendants breached their duties owed to Plaintiff and Class Members by failing to safeguard the Private Information that Defendants collected and maintained, including by failing to implement industry standards for data security to

protect against cyberattacks or reasonably supervise their vendor's cybersecurity practices, which allowed criminal hackers to access and steal thousands of individuals' Private Information from Defendants' care.

10.    Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendants, especially given their statuses as highly sophisticated technology companies, and thus, Defendants knew that failing to take reasonable steps to secure the Private Information left it in a dangerous condition.

11.    Defendants failed to adequately protect Plaintiff's and Class Members' Private Information—and failed to even encrypt or redact this highly sensitive data or implement menial standards to prevent unauthorized intrusion to the cloud-based servers storing it. This unencrypted, unredacted Private Information was compromised due to Defendants' negligent and/or careless acts and omissions and their utter disregard for Plaintiff's and Class Members' privacy.

12.    Defendants breached their duties and obligations by failing, in one or more of the following ways: (a) to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (b) to design, implement, and maintain reasonable data retention policies; (c) to adequately train or oversee staff and service providers regarding data security; (d) failing to comply with industry-standard data security practices; (e) to warn Plaintiff and Class Members of

Defendants' inadequate data security practices; (f) to encrypt or adequately encrypt the Private Information; (g) to ensure their vendor handling Private Information had industry-standard data security to protect it; (h) to recognize or detect that Salesloft's server had been compromised and accessed in a timely manner to mitigate the harm; (i) to utilize, or to ensure their vendor utilized, widely available software able to detect and prevent this type of attack; (j) and to otherwise secure the Private Information using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

13.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality and security of their Private Information. In providing their Private Information to Defendants, Plaintiff and the Class Members reasonably expected these sophisticated SaaS companies to keep their Private Information confidential and security maintained, to use this information for business purposes, and to disclose it only as authorized. Defendants failed to do so, resulting in the unauthorized disclosure of their Private Information in the Data Breach.

14.     Hackers specifically targeted and obtained Plaintiff's and Class Members' Private Information from Defendants because of the data's value in exploiting and stealing Plaintiff's and Class Members' identities. As a direct and proximate result of Defendants' inadequate data security and breaches of their duties to handle Private Information with reasonable care, Plaintiff's and Class Members'

Private Information was accessed by cybercriminals and exposed to an untold number of unauthorized individuals.

15.     The risk of identity theft caused by this Data Breach is impending and has materialized, as there is evidence that the Plaintiff's and Class Members' Private Information was targeted, accessed, misused, and disseminated on the dark web. The risk to Plaintiff and Class Members as victims of the Data Breach will remain for their respective lifetimes.

16.     As a result of the Data Breach, Plaintiff and Class Members, suffered concrete injuries in fact including, but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) actual identity theft and fraud; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of privacy; (h) emotional distress including anxiety and stress in with dealing with the Data Breach; and (i) the continued risk to their sensitive Private Information, which remains in Defendants' possession and subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect the consumer PII they collect and maintain.

17.    To recover for these harms, Plaintiff, individually and on behalf of the Class as defined herein, brings claims for negligence/negligence *per se*, breach of implied contract, breach of third-party beneficiary contract, and unjust enrichment to address Defendants' inadequate safeguarding of Plaintiff's and Class Members' Private Information in Defendants' care and the host of injuries that resulted.

18.    Plaintiff and Class Members seek compensatory, nominal, statutory, and punitive damages, declaratory judgment, and injunctive relief requiring Defendants to (a) disclose, expeditiously, the full nature of the Data Breach and the types of Private Information exposed; (b) implement improved data security practices to reasonably guard against future breaches of Private Information in Defendants' possession; and (c) provide, at Defendants' own expense, all impacted Data Breach victims with lifetime identity theft protection services.

## II.    PARTIES

19.    Plaintiff Brandie Keegan is an adult individual and a resident of Scott County, Iowa.

20.    Defendant Salesloft, Inc. is incorporated under Delaware law with its principal place of business at 1180 W Peachtree Street NW, Suite 2400, Atlanta, Georgia 30309.

21.    Defendant AppFolio, Inc. is incorporated under Delaware law with its principal place of business at 70 Castilian Drive, Santa Barbara, California 93117.

22.    The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave of court to amend this complaint if appropriate to reflect the names and capacities of other responsible parties should their identities become known.

## III.  JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5 million, exclusive of interest and costs, and the number of Class Members exceeds 100, many of whom (including Plaintiff) have different citizenship from Defendants.

24.    This Court has personal jurisdiction over Salesloft because it is a Georgia citizen headquartered in Georgia, and it engages in substantial and not isolated activity in this state.

25.    This Court has personal jurisdiction over AppFolio because it is engaged in substantial and not isolated activity in Georgia and has sufficient minimal conducts with this state by virtue of its engaging in business in Georgia, including by contracting with Georgia-headquartered Salesloft for its software platform and collecting and/or storing Plaintiff's and Class Members' Private Information in the

state, which activities and business give rise to Plaintiff's and Class Members' causes of action alleged herein.

26.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants operate in this District and a substantial part of the events or omissions giving rise to Plaintiff's and Class Members' claims occurred in this District, including Defendants' collecting, storing, and/or failing to secure Plaintiff's and Class Members' Private Information.

## IV. GENERAL FACTUAL ALLEGATIONS

### A.    Defendants Collected and Maintained Plaintiff's and Class Members' Private Information to Operate and Facilitate their Respective Businesses.

27.    Salesloft is a SaaS company that provides a variety of software products by subscription to its corporate clients, including the Drift Platform, Salesloft's AI-powered platform offering AI chatbot engagement, sales automation, customer data processing and analytics, buyer and prospect insight, and workflow integration functions through integration of multiple SaaS applications. Salesloft's Drift Platform is one of the most widely used SaaS integrations in the world.

28.    AppFolio is a Salesloft client, subscribing to the Drift Platform for integrated customer relation management (CRM) functions in connection with AppFolio's cloud-based real estate management platform.

29.     As a necessary part of using Salesloft's Drift Platform, Salesloft's clients grant Salesloft access to and control over consumer PII, including names, dates of birth, addresses, Social Security numbers, and other non-public, sensitive PII. The information Salesloft held on its server systems at the time of the Data Breach included the unencrypted Private Information of Plaintiff and Class Members.

30.     The Drift Platform works by issuing Open Authorization (OAuth) tokens to third-party applications like Salesforce, Google Workspace, Slack, Snowflake, AWS, and more, which allows Drift to connect with the third-party applications and access the user data stored thereon.

31.     In addition to AppFolio, a number of other Salesloft clients provided consumers' PII to Salesloft via use of the Drift Platform, which PII was also compromised in the Data Breach.

32.     As part of its business, AppFolio collects and maintains the Private Information of current and former consumers transacting with AppFolio customers, including Plaintiff and Class Members. To operate its business and use the Drift Platform platform, AppFolio provided Plaintiff's and Class Members' Private Information to Salesloft.

33.    Plaintiff and Class Members were required to entrust their highly sensitive Private Information to Defendants and in exchange, Defendants promised by implication to reasonably protect that sensitive data.

34.    At all relevant times, Defendants knew they were storing and using their platforms and servers' systems to store and transmit valuable, sensitive Private Information belonging to Plaintiff and Class Members, and that as a result, their systems would be attractive targets for cybercriminals.

35.    Defendants also knew that any breach of their information technology systems and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the thousands of individuals whose Private Information was compromised, as well as intrusion into those individuals' personal health matters.

36.    Defendants derived economic benefits from collecting Plaintiff's and Class Members' Private Information—their respective businesses are built on software platforms meant for that precise purpose. Without the required submission of Private Information, Defendants could not perform its operations, furnish the software platforms they provide, or generate revenue.

37.    In exchange for receiving Plaintiff's and Class Members' Private Information, Defendants promised to safeguard the sensitive, confidential data and ensure it was used only for authorized and legitimate purposes, to delete such

information once there was no longer a need to maintain it, and to ensure the same practices from vendors handling Private Information.

38.     Additionally, Salesloft had service agreements with all clients, including AppFolio, requiring Salesloft to adequately protect the consumer Private Information it collected, used, stored, and transmitted on the Drift Platform through industry standard measures, and to maintain consumer PII's confidentiality. Salesloft's agreements with its clients also incorporated a Data Security Addendum specifically obligating both Salesloft and its clients, including AppFolio, to maintain consumer PII's confidentiality, prevent unauthorized disclosure, and protect PII with specific security measures sufficient to do so, like encrypting PII, training employees to prevent unauthorized access, and implementing sufficient monitoring and alerts.

39.     But for Defendants' promises to keep Plaintiff's and Class Members' Private Information secure and confidential, Plaintiff and Class Members would not have entrusted their Private Information to Defendants. Consumers in general demand security for their Private Information, especially when Social Security numbers are involved.

**B.     Defendants Owed Duties to Adopt Reasonable Data Security Measures for Private Information they Collected and Maintained.**

40.     As part of their respective businesses, Defendants collect and maintain hundreds of thousands of individuals' Private Information, including that of Plaintiff and Class Members.

41.    Defendants had and continue to have duties to adopt reasonable measures to keep Plaintiff's and Class Members' Private Information confidential and protected from disclosure to unauthorized third parties, and to audit, monitor, and verify the integrity of their IT networks and those of their vendors and affiliates.

42.    Defendants' obligations stem from the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45, common law, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and protected from unauthorized disclosure.

43.    Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information. To that end, Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

44.    Based on the foregoing representations and warranties and to obtain healthcare, Plaintiff and Class Members provided their Private Information to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their promises and obligations to keep such information confidential and protected against unauthorized access.

45.    Additionally, by obtaining, using, and benefitting from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties

and knew or should have known they were responsible for protecting that Private Information from unauthorized access and disclosure.

46.    Defendants' duty to protect Plaintiff and Class Members from the foreseeable risk of injury that inadequate data protection and unauthorized exposure of their Private Information would cause obligated Defendants to implement reasonable practices to keep that Private Information confidential and securely maintained, to use and disclose it for necessary and authorized purposes only, to delete it from network systems when no longer needed, and to ensure the same data security protocols and procedures from their vendors. Defendants failed to do so.

**C.    Defendants' Failures to Adequately Safeguard Plaintiff's and Class Member's Private Information Caused the Data Breach.**

47.    On or about October 6, 2025, AppFolio began sending Data Breach victims correspondence informing them of the Data Breach ("Notice Letters").

48.    The Notice Letters generally inform as follows, in part:

> **What Happened?** On August 22, 2025, we were made aware of a security incident affecting Salesloft, a provider of sales enablement software and one of our vedors. This incident, which reportedly impacted hundreds of organizations, allowed unauthorized access to records in AppFolio's hosted CRM system between August 8 to August 18, 2025. . . .
>
> **What Information Was Involved?** The records accessed by the unauthorized actor contained information that included names, addresses, dates of birth, and Social Security numbers.

49.    The Notice Letters also advised Plaintiff and Class Members "to be vigilant for incidents of fraud and identity theft by reviewing your account statements and free credit reports for unauthorized activity." In addition, the Notice Letters encouraged victims of the Data Breach to take other steps such as placing fraud alerts, placing credit freezes, and contacting law enforcement.

50.    Omitted from the Notice Letters were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information is protected.

51.    Thus, Defendants' purported disclosure amounts to no real disclosure at all, as it fails to inform Plaintiff and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiff's and Class Members' ability to mitigate the harms from the Data Breach is severely diminished.

52.    Since receiving the Notice Letter, Plaintiff has learned the notorious threat actor known as 'GRUB1' was behind the Data Breach, and carried out the attack by gaining unauthorized access to OAuth tokens issues by the Drift Platform, then using those tokens to connect with customers' servers and APIs integrated with the Drift Platform.

53.    Once the GRUB1 threat actor gained access, between August 8 and August 18, 2025, approximate, it performed recognizance to find sensitive consumer PII and then exfiltrated that confidential Private Information in bulk.

54.    While Salesloft initially reported that only Salesforce integrations were affected, it has since been reported that Private Information contained on other Drift Platform integrations, including Google Workspace, Slack, and more, was also compromised in the Data Breach.

55.    Upon information and belief, the threat actor gained initial access to Drift Platform-issued OAuth tokens through rudimentary phishing and social engineering techniques to pirate legitimate user credentials.

56.    As the Data Breach evidences, Defendants did not use reasonable security measures appropriate to the nature of the sensitive Private Information they collected and maintained from Plaintiff and Class Members, such as encrypting the information or deleting it when it is no longer needed, or ensuring their vendors did the same. These failures by Defendants allowed and caused cybercriminals to target Plaintiff's and Class Members' Private Information and carry out the Data Breach.

57.    Plaintiff's and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals in the Data Breach. Criminal hackers accessed and acquired confidential servers containing Plaintiff's and Class

Members' Private Information from Drift Platform integrations and instances, where they were kept without adequate safeguards and in unencrypted form.

58.    Defendants could have prevented this Data Breach by ensuring the files and servers containing Plaintiff's and Class Members' Private Information were properly secured, sanitized, and encrypted, but failed to do so.

59.    Additionally, upon information and belief, Defendants failed to require phishing-resistant multi-factor authentication ("MFA") where possible or adequately train their employees to recognize and report phishing attempts. Had Defendants required phishing-resistant MFA, and/or adequately trained their employees on reasonable and basic cybersecurity topics like common phishing techniques or indicators of a potentially malicious event, the threat actor would not have been able to carry out the Data Breach.

60.    Defendants' tortious conduct and breach of contractual obligations, as detailed in this Complaint, are evidenced by their failure to recognize the Data Breach until cybercriminals had already breached Salesloft's server and obtained Plaintiff's and Class Members' Private Information—meaning Defendants had no effective means in place to ensure foreseeable attacks were detected and prevented.

**D.    Defendants Knew of the Risk of a Cyberattack because SaaS Companies in Possession of PII are Particularly Suspectable.**

61.    Defendants' negligence in failing to safeguard Private Information is exacerbated by the repeated warnings on the need to protect and secure sensitive PII.

62.     Private Information of the kind accessed in the Data Breach is of great value to cybercriminals as it can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, and sale on the internet black market known as the dark web.

63.     Private Information can also be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and financial records. This may be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, like his or her birthdate, birthplace, or mother's maiden name.

64.     Data thieves regularly target businesses in the technology industry like Defendants due to the highly sensitive information that such entities maintain. Defendants knew and understood that unprotected Private Information is highly sought after by criminals who seek to illegally monetize that Private Information through unauthorized access.

65.     Cyber-attacks against institutions such as Defendants are targeted and frequent. According to Contrast Security's 2023 report *Cyber Bank Heists: Threats to the financial sector*, "Over the past year, attacks have included banking trojans, ransomware, account takeover, theft of client data and cybercrime cartels deploying

'trojanized' finance apps to deliver malware in spear-phishing campaigns."[1]  In fact, "40% [of financial institutions] have been victimized by a ransomware attack."[2]

66.    In light of past high profile data breaches at industry-leading companies, including, for example, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or, if acting as reasonable businesses handling PII and PHI, should have known that the Private Information they collected and maintained would be vulnerable to and targeted by cybercriminals.

67.    According to the Identity Theft Resource Center's report covering the year 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506) set in 2017."[3]

68.    The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including

---

[1] Contrast Security, "Cyber Bank Heists: Threats to the financial sector," pg. 5, avail. at https://www.contrastsecurity.com/hubfs/Cyber%20Bank%20Heists%20Report%2020 23.pdf?hsLang=en (last visited Aug. 22, 2024).
[2] *Id.*, at 15.
[3] *See* "Identity Theft Resource Center's 2021 Annual Data Breach Report Sets New Record for Number of Compromises," ITRC, Jan. 24, 2022,    available    at https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/ (last visited Aug. 22, 2024 ).

Defendants themselves. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[4]

69.    As sophisticated technology companies in possession of consumers' Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if their or their vendor's systems were breached. Such consequences include the significant costs imposed on Plaintiff and Class Members due to a breach. Nevertheless, Defendants failed to implement or follow reasonable cybersecurity measures to protect against the Data Breach.

70.    Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

71.    Given the nature of the Data Breach, it was foreseeable that Plaintiff's and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals for use in variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiff's and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiff's and Class Members' names.

---

[4] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at https://www.ibm.com/reports/data-breach (last accessed Feb. 9, 2024).

72.    Defendants were fully aware of the unique type and the significant volume of data on Salesloft's server(s), amounting to thousands of individuals detailed Private Information, and, thus, that these individuals would be harmed by the unauthorized disclosure of that unencrypted data.

73.    Plaintiff and Class Members were the foreseeable and probable victims of Defendants' inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that information.

74.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and the like.

**E.    Defendants Were Required, But Failed to Comply with FTC Rules and Guidance.**

75.    The FTC has promulgated numerous guides that highlight the importance of implementing reasonable data security practices. According to the FTC, data security should be factored into all business decision-making.

76.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*,[5] which establishes cyber-security guidelines for

---

[5] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM. (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Aug. 22, 2024).

businesses like Defendants. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

77.    The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[6]

78.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

79.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect third parties' confidential data, treating the failure to employ reasonable and appropriate measures to protect against

---

[6] *Id.*

unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures business like Defendant must undertake to meet their data security obligations. *See, e.g., In the Matter of LabMD, Inc*., 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

80.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duties in this regard.

81.     The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[7]

---

[7] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

82.    Defendants failed to properly implement basic data security practices, in violation of their duties under the FTC Act.

83.    Defendants' failures to employ reasonable and appropriate means to protect against unauthorized access to Plaintiff's and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by the FTC Act.

**F.    Defendants Failed to Comply with Industry Standards.**

84.    A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards.

85.    The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.

86.    In addition, the NIST recommends certain practices to safeguard systems, infra, such as the following:

a.  Control who logs on to your network and uses your computers and other devices.

b.  Use security software to protect data.

c.  Encrypt sensitive data, at rest and in transit.

d.  Conduct regular backups of data.

e.  Update security software regularly, automating those updates if possible.

f.  Have formal policies for safely disposing of electronic files and old devices; and

g.  Train everyone who uses your computers, devices, and network about cybersecurity.

87.    Further still, the Cybersecurity & Infrastructure Security Agency makes specific recommendations to organizations to guard against cyberattacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking

steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior, [e]nabl[ing] logging in order to better investigate issues or events[,] and [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated"; (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and; (d) other steps.[8]

88.    Upon information and belief, Defendants failed to implement industry standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, as well as failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

---

[8] Cybersecurity & Infrastructure Security Agency, "Shields Up: Guidance for Organizations," available at https://www.cisa.gov/shields-guidance-organizations (last visited Feb. 9, 2024).

**G.    Defendants Owed Common Law Duties to Safeguard PII.**

89.    In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their and/or their vendors' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. These duties owed to Plaintiff and Class Members obligated Defendants to provide reasonable data security consistent with industry standards and requirements to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure.

90.    Defendants owed duties to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in their and/or their vendors' possession, including adequately training their employees and others who accessed Private Information on how to adequately protect Private Information.

91.    Defendants owed duties to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

92.    Defendants owed duties to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

93.    Defendants owed duties to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

94.    Defendants owed duties to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

95.    Defendants failed to take the necessary precautions to safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized disclosure. Defendants' actions and omissions represent a flagrant disregard of Plaintiff's and Class Members' rights.

**H.    Plaintiff and Class Members Suffered Common Injuries and Damages due to Defendants' Conduct.**

96.    Defendants' failure to use adequate data security measures for Plaintiff's and Class Members' Private Information directly and proximately caused injuries to Plaintiff and Class Members via their Private Information's wrongful disclosure in the Data Breach.

97.    The ramifications of Defendants' failures to keep secure the Private Information of Plaintiff and Class Members are long-lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

98.    Plaintiff and Class Members are also at a continued risk because their Private Information remains in Defendants' systems, which have already been shown to be susceptible to compromise and are subject to further attack so long as

Defendants fail to undertake the necessary and appropriate security and training measures to protect their customers' Private Information.

99.    As a result of Defendants' ineffective and inadequate data security practices, the consequential Data Breach, and the foreseeable outcome of Plaintiff's and Class Members' Private Information ending up in criminals' possession, all Plaintiff and Class Members have suffered and will continue to suffer the following actual injuries and damages, without limitation: (a) invasion of privacy; (b) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of the benefit of their bargain with Defendants; (h) emotional distress including anxiety and stress in dealing with the Data Breach's aftermath; and (i) the continued risk to their sensitive Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake adequate measures to protect it.

### *Present and Ongoing Risk of Identity Theft*

100.   Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

101.   The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[9] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[10]

102.   The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

103.   The dark web is an unindexed layer of the internet that requires special software or authentication to access.[11] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's

---

[9] 17 C.F.R. § 248.201 (2013).
[10] *Id.*
[11] *What Is the dark web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

web     address     is     cia.gov,     but     on     the     dark     web     it     is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.

104.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, PII like the Private Information at issue here.[12] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[13] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[14]

105.    The unencrypted Private Information of Plaintiff and Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff

---

[12] *What is the dark web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[13] *Id.; What Is the dark web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[14] *What is the dark web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

and Class Members. Unauthorized actors can easily access and misuse Plaintiff's and Class Members' Private Information due to the Data Breach.

106.   Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

107.   For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

108.   Social Security numbers, for example, are among the worst kinds of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you.

> Identity thieves can use your number and your good credit
> to apply for more credit in your name. Then, they use the
> credit cards and don't pay the bills, it damages your credit.
> You may not find out that someone is using your number
> until you're turned down for credit, or you begin to get
> calls from unknown creditors demanding payment for
> items you never bought. Someone illegally using your
> Social Security number and assuming your identity can
> cause a lot of problems.[15]

109.   What's more, it is no easy task to change or cancel a stolen Social

Security number. An individual cannot obtain a new Social Security number without

significant paperwork and evidence of actual misuse. In other words, preventive

action to defend against the possibility of misuse of a Social Security number is not

permitted; an individual must show evidence of actual, ongoing fraud activity to

obtain a new number.

110.   Even then, new Social Security number may not be effective, as "[t]he

credit bureaus and banks are able to link the new number very quickly to the old

number, so all of that old bad information is quickly inherited into the new Social

Security number."[16]

111.   Identity thieves can also use Social Security numbers to obtain a

driver's license or official identification card in the victim's name but with the thief's

---

[15] Social Security Administration, *Identity Theft and Your Social Security Number*, available at:
https://www.ssa.gov/pubs/EN-05-10064.pdf.
[16] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR
(Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-
millions-worrying-about-identity-theft (last visited Aug. 23, 2024).

picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name. And the Social Security Administration has warned identity thieves can use someone's Social Security number to apply for credit lines.

112.   One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[17]

113.   With Fullz packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally

---

[17] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Feb. 26, 2024).

stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

114.   The development of Fullz packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

115.   Thus, even if certain information (such as driver's license numbers) was not stolen in a breach, criminals can still create a comprehensive Fullz package. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

116.   The development of Fullz packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or

a jury, to find that their stolen Private Information is being misused, and that such misuse is traceable to the Data Breach.

117.    Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice,

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[18]

118.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[19]

119.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

---

[18] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed Jan. 23, 2024).
[19] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.

120.   Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

### *Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

121.   In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

122.   As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

123.   In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record

124.   Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their accounts for many years to mitigate that harm.

125.   Plaintiff and Class Members have spent time, and will spend additional time in the future, on a variety of prudent actions, such as placing freezes and alerts with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

126.   These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies

to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[20]

127.   Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendants' conduct that caused the Data Breach.

### *Diminished Value of Private Information*

128.   Private Information is a valuable property right.[21] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. This obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

129.   For example, drug and medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies

---

[20] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited Feb. 26, 2024).
[21] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PRIVATE INFORMATION") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PRIVATE INFORMATION, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

130.   Private Information can sell for as much as $363 per record.

131.   An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.

132.   As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where it holds significant value for the threat actors.

133.   However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

### *Reasonable and Necessary Future Cost of Credit Monitoring*

134.   To date, Defendants have done little to nothing to provide Plaintiff and Class Members with relief for the damages they suffered due to the Data Breach.

135.   Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money, filing false tax returns, taking out loans or lines of credit, or filing false unemployment claims.

136.   Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that her or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

137.   Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts. The information disclosed in this Data Breach is impossible

to "close" and difficult, if not impossible, to change (such as Social Security numbers).

138.   Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future, if not forever.

139.   The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

## V. PLAINTIFF'S EXPERIENCES AND INJURIES

140.   On or about October 6, 2025, Plaintiff received a Notice Letter informing that her Private Information, including her name, address, date of birth, and Social Security number, was compromised in the Data Breach.

141.   Plaintiff was required to supply Defendants with her Private Information as a condition of transacting with AppFolio's customers.

142.   Plaintiff greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private

Information over the internet or any other unsecured source.

143.   Plaintiff would not have provided her Private Information to Defendants had she known it would be kept using inadequate data security and vulnerable to a cyberattack.

144.   At the time of the Data Breach, Defendants retained Plaintiff's Private Information on Salesloft's servers and platform with inadequate data security, causing her Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

145.   Plaintiff has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial account statements and other information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities. Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

146.   Due to the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come. The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff's and Class Members' Private Information was targeted, accessed, misused, and has or will imminently be disseminated on the dark web, as that is the *modus operandi*

of cybercriminals that commit attacks of this type.

147.   The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence or the information stolen.

## VI.    CLASS ACTION ALLEGATIONS

148.   Plaintiff brings this nationwide class action on behalf of herself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

149.   The class Plaintiff seeks to represent is defined as follows:

> All individuals in the United States whose Private Information may have been compromised in the Data Breach, including all individuals who received a Notice Letter ("Class").

150.   Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

151.   Plaintiff reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

152.  **Numerosity:** The Class is so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, it has been reported that the Private Information of at least 72,000 individuals throughout the United States was compromised in the Data Breach.

153.  **Commonality:** Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a.  Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b.  Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiff and Class Members;

c.  Whether Defendants had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

d.  Whether Defendants had duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

e.  Whether Defendants knew or should have known of the data security vulnerabilities that allowed the Data Breach to occur;

f.  Whether Defendants failed to adequately safeguard the Private Information of Plaintiff and Class Members;

g.  Whether Defendants' data security systems and procedures prior to, during, and since the Data Breach complied with industry standards;

h.  When Defendants actually learned of the Data Breach;

i.  Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members their Private Information had been compromised;

j.  Whether Defendants violated data breach notification laws by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

k.  Whether Defendants' conduct violated the FTC Act;

l.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

m.  Whether Defendants adequately addressed and fixed the vulnerabilities that permitted the Data Breach to occur;

n.  Whether Defendants were unjustly enriched by failing to provide adequate security for Plaintiff's and Class Members' Private Information;

o.  Whether Plaintiff and Class Members are entitled to actual, consequential, nominal, statutory, and/or punitive damages as a result of Defendants' wrongful conduct; and

p. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm the Data Breach caused.

154. **Typicality:** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subject to the same unlawful conduct as alleged herein, and were damaged in the same way. Plaintiff's Private Information was in Defendants' possession at the time of the Data Breach and was compromised due to the Data Breach. Plaintiff's damages and injuries are akin to those of other Class Members and Plaintiff seek relief consistent with the relief of the Classes.

155. **Adequacy:** Plaintiff are adequate representatives of the Class because Plaintiff is a Class Member, and is committed to pursuing this matter against Defendants to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's Counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

156. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when

damages to Plaintiff and Class Members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and Class Members are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

157. **Manageability:** The litigation of the class claims alleged herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates there would be no significant manageability problems with prosecuting this lawsuit as a class action. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

158. **Ascertainability:** All members of the proposed Class are readily ascertainable. The Class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Class. Defendants have access to information regarding the individuals affected by the Data

Breach, and Defendants have already provided notifications to some or all of those people. Using this information, the members of the Class can be identified, and their contact information ascertained for purposes of providing notice.

## VII.    CAUSES OF ACTION

### COUNT I: NEGLIGENCE/NEGLIGENCE *PER SE*
**(Against Salesloft)**

159.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 158 above as if fully set forth herein.

160.   Defendants required Plaintiff and Class Members to submit, directly or indirectly, personal, confidential Private Information to Salesloft.

161.   Plaintiff and Class Members, through AppFolio, provided certain Private Information to Salesloft including their names, addresses, dates of birth, Social Security numbers, and other sensitive information.

162.   Salesloft had full knowledge of the sensitivity of the Private Information to which it was entrusted, and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons. Salesloft had duties to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting their Private Information.

163.   Plaintiff and Class Members were the foreseeable victims of any inadequate safety and security practices by Salesloft.

164.    Plaintiff and Class Members had no ability to protect their Private Information in Salesloft's possession.

165.    By collecting and storing Plaintiff's and Class Members' Private Information, Salesloft had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the Private Information from theft.

166.    Salesloft owed a duty to Plaintiff and Class Members to provide data security consistent with industry standards and legal and regulatory requirements, to ensure that its systems and the personnel responsible for them adequately protected Plaintiff's and Class Members' Private Information.

167.    Salesloft was able to ensure that its systems and data security procedures were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a cybersecurity event like this Data Breach, whereas Plaintiff and Class Members were not.

168.    Salesloft had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

169.   Pursuant to the FTC Act, Salesloft had a duty to provide adequate systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

170.   Salesloft breached its duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information and by failing to encrypt or timely delete the Private Information from its network systems.

171.   Salesloft's violations of the FTC Act as described herein directly caused and/or were a substantial factor in the Data Breach and resulting injuries to Plaintiff and Class Members.

172.   Plaintiff and Class Members are within the class of persons the FTC Act was intended to protect.

173.   The type of harm that resulted from the Data Breach was the type of harm the FTC Act was intended to guard against.

174.   Salesloft's failures to comply with the FTC Act is negligence *per se.*

175.   Salesloft's duties to use reasonable care in protecting Plaintiff's and Class Members' Private Information arose not only as a result of the statutes and regulations described above, but because Salesloft is bound by industry standards to secure such Private Information.

176.   Salesloft breached its duties and was negligent by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure in the Data Breach. The specific negligent acts and omissions committed by Salesloft include, but are not limited to, the following:

a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

b.   Failing to adequately train employees on proper cybersecurity protocols;

c.   Failing to adequately monitor the security of its information technology networks and systems;

d.   Failure to periodically ensure that its network systems had plans in place to maintain reasonable data security safeguards; and

e.   Allowing unauthorized access to Plaintiff's and Class Members' Private Information.

177.   But for Salesloft's wrongful and negligent breaches of its duties owed to Plaintiff and Class Members, the Data Breach would not have occurred or at least would have been mitigated, Plaintiff's and Class Members' Private Information would not have been compromised, and Plaintiff's and Class Members' injuries would have been avoided.

178.   It was foreseeable that Salesloft's failures to use reasonable measures to protect Plaintiff's and Class Members' Private Information would injure Plaintiff

and Class Members. Further, the breach of security was reasonably foreseeable to Salesloft given the known high frequency of cyber-attacks and data breaches in Salesloft's industry.

179.    It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Private Information would cause them one or more types of injuries.

180.    As a direct and proximate result of Salesloft's negligence, Plaintiff and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) actual identity theft and fraud; (d) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (e) loss of benefit of their bargain; and (f) the continued and certainly increased risk to their Private Information, which remains (i) unencrypted and available for unauthorized third parties to access and abuse; and (ii) in Salesloft's possession and subject to further unauthorized disclosures so long as Salesloft fails to undertake appropriate and adequate measures to protect it.

181.    As a direct and proximate result of Salesloft's negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

182.   Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## COUNT II: NEGLIGENCE/NEGLIGENCE *PER SE*
### (Against AppFolio)

183.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 158 above as if fully set forth herein.

184.   AppFolio required Plaintiff and Class Members to submit, directly or indirectly, personal, confidential Private Information to AppFolio and its vendor Salesloft.

185.   Plaintiff and Class Members provided certain Private Information to AppFolio and, through AppFolio, to Salesloft, including their names, dates of birth, addresses, Social Security numbers, and other sensitive information.

186.   AppFolio had full knowledge of the sensitivity of the Private Information to which they were entrusted, and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons. AppFolio had duties to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting their Private Information, including requiring and ensuring their business associate/vendors handling Private Information had reasonable and appropriate data security measures and policies in place to do so.

187.  Plaintiff and Class Members were the foreseeable victims of any inadequate safety and security practices by AppFolio or its vendor Salesloft.

188.  Plaintiff and Class Members had no ability to protect their Private Information in AppFolio's or Salesloft's possession.

189.  By collecting and storing Plaintiff's and Class Members' Private Information, AppFolio had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the Private Information from theft.

190.  AppFolio's duty of care obligated it to require and ensure that Salesloft provided data security data security consistent with industry standards and legal and regulatory requirements, and that Salesloft's systems and networks and the personnel responsible for them adequately protected Plaintiff's and Class Members' Private Information.

191.  AppFolio's duty of care further obligated it to ensure Salesloft's processes to detect compromises of Private Information were sufficient.

192.  AppFolio was able to ensure Salesloft's systems and data security procedures were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a cybersecurity event like this Data Breach, whereas Plaintiff and Class Members were not.

193.   AppFolio had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

194.   Pursuant to the FTC Act, 15 U.S.C. § 45, AppFolio had a duty to provide adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

195.   AppFolio breached its duties to Plaintiff and Class Members under the FTC Act by failing to require its vendor Salesloft provide fair, reasonable, or adequate systems and data security practices to safeguard Plaintiff's and Class Members' Private Information, by failing to ensure the Private Information on Salesloft's server(s) and/or Drift Platform instances was encrypted and timely deleted when no longer needed.

196.   AppFolio's violations of the FTC Act as described herein directly caused and/or were a substantial factor in the Data Breach and resulting injuries to Plaintiff and Class Members.

197.   Plaintiff and Class Members are within the class of persons the FTC Act was intended to protect.

198.   The type of harm that resulted from the Data Breach was the type of harm the FTC Act was intended to guard against.

199.   AppFolio's failures to comply with the FTC Act is negligence *per se.*

200.   AppFolio's duties to use reasonable care in protecting Plaintiff's and Class Members' Private Information arose not only as a result of the statutes and regulations described above, but also because AppFolio are bound by industry standards to secure such Private Information.

201.   AppFolio breached its duties and was negligent by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure in the Data Breach. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to require and periodically ensure that Salesloft adopted, implemented, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

b. Failing to adequately monitor the security of Salesloft's information technology networks and systems;

c. Failure to require and periodically ensure that Salesloft's network systems had plans in place to maintain reasonable data security safeguards; and

d. Allowing unauthorized access to Plaintiff's and Class Members' Private Information.

202.   But for AppFolio's wrongful and negligent breaches of their duties owed to Plaintiff and Class Members, the Data Breach would not have occurred or

at least would have been mitigated, Plaintiff's and Class Members' Private Information would not have been compromised, and Plaintiff's and Class Members' injuries would have been avoided.

203.   It was foreseeable that AppFolio's failures to use reasonable measures to protect Plaintiff's and Class Members' Private Information would injure Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable to AppFolio given the known high frequency of cyber-attacks and data breaches in Defendants' industry.

204.   It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Private Information would cause them one or more types of injuries.

205.   As a direct and proximate result of AppFolio's negligence, Plaintiff and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) actual identity theft and fraud; (d) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (e) loss of benefit of their bargain; and (f) the continued and certainly increased risk to their Private Information, which remains (i) unencrypted and available for unauthorized third parties to access and abuse; and (ii) in AppFolio's and Salesloft's possession and subject to further unauthorized

disclosures so long as AppFolio and Salesloft fail to undertake appropriate and adequate measures to protect it.

206.   As a direct and proximate result of AppFolio's negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

207.   Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## COUNT IV: BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
### (Against Salesloft and AppFolio)

208.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 158 above as if fully set forth herein.

209.   Salesloft entered into uniform written contracts with its clients, including AppFolio, to provide an integrated software platform and related services in connection with customer relationship management and related functions.

210.   Pursuant to these contracts, Salesloft's clients, including AppFolio, agreed to provide Salesloft with compensation and Plaintiff's and Class Members' Private Information, and Salesloft received Plaintiff's and Class Members' Private Information from Salesloft's clients in the course of providing its software platform and related services.

211.   In exchange for payment and Plaintiff's and Class Members' Private Information, Salesloft promised to provide its Drift Platform and related services to AppFolio and its other clients.

212.   As a material term of these contracts, each Defendant promised the other to implement specific, adequate, and industry-standard data security measures to safeguard Plaintiff's and Class Members' Private Information from unauthorized disclosure, to maintain the Private Information's confidentiality and to timely notify Plaintiff and Class Members of the Data Breach.

213.   These contracts obligating each Defendant to use reasonable data security for Plaintiff's and Class Members' Private Information and maintain that data's confidentiality create a class of intended beneficiaries whose members are implied into such agreements by operation of law. Plaintiff and Class Members are the intended beneficiaries of the contracts between Salesloft and AppFolio and/or Salesloft's other clients.

214.   These contracts between Salesloft and its clients, including AppFolio, were made to facilitate the transactions between Salesloft's clients and their customers, to integrate Plaintiff's and Class Members' data, and to store and manage Plaintiff's and Class Members' PII, and to sufficiently safeguard that data with technologically sound measures, such that they were made expressly for the benefit of Plaintiff and Class Members as the intended third-party beneficiaries.

215.  Salesloft knew Plaintiff and Class Members were involved and were meant to benefit from the transactions that were subject to these contracts between Salesloft.

216.  Salesloft knew that if it breached its contractual obligation to adequately safeguard its clients' customers' Private Information, Plaintiff and Class Members would be harmed.

217.  Salesloft breached these contracts with AppFolio and its other clients, by, among other acts and omissions, failing to use reasonable data security measures or implement adequate protocols and employe training sufficient to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure.

218.  AppFolio knew Plaintiff and Class Members were involved and were meant to benefit from the transactions that were subject to these contracts between it and AppFolio.

219.  AppFolio knew that if it breached its contractual obligation to adequately safeguard its clients' customers' Private Information, Plaintiff and Class Members would be harmed.

220.  AppFolio breached these contracts with Salesloft by, among other acts and omissions, failing to use reasonable data security measures or implement adequate protocols and employe training sufficient to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure.

221.   As a direct and proximate result of Defendants' breaches of these contracts, Plaintiff and Class Members have suffered and will continue to suffer injuries as set forth herein, and are entitled to damages sufficient to compensate for the losses they sustained as a direct result thereof.

## COUNT XI: UNJUST ENRICHMENT
### (Against Salesloft and AppFolio)

222.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 158 above as if fully set forth herein.

223.   Plaintiff and Class Members conferred benefits on Defendants by way providing, directly or indirectly, their Private Information to Defendants as part of Defendants' respective businesses.

224.   Defendants required Plaintiff's and Class Members' Private Information to conduct their respective businesses and generate revenue, which they could not do without collecting and maintaining Plaintiff's and Class Members' Private Information.

225.   The monies Plaintiff and Class Members paid to Defendants included a premium for Defendants' cybersecurity obligations and were supposed to be used by Defendants, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiff's and Class Members' Private Information.

226.    Additionally, a reasonable portion of the profit Salesloft made from furnishing its software platform to its clients, which necessarily required Salesloft's access to patient Private Information, should have been put towards data security measures that would adequately protect the Private Information in Salesloft's care.

227.    Further, a reasonable portion of the costs AppFolio saved through streamlining operations by using Salesloft's platform should have been put towards sufficient data security measures and oversight of its vendor Salesloft's practices, to adequately protect the Private Information Plaintiff and Class Members entrusted to AppFolio.

228.    Instead, Defendants enriched themselves by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to increase their own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to Defendants' own coffers. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the requisite security and the safety of consumers' Private Information.

229.   Defendants failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiff and Class Members, and as a result, Defendants were unjustly enriched.

230.   Under principles of equity and good conscience, Defendants should not be permitted to retain their ill-gotten gains because they failed to provide adequate safeguards and security measures to protect Plaintiff's and Class Members' Private Information, which Plaintiff and Class Members paid for but did not receive.

231.   Defendants wrongfully accepted and retained these benefits—payment and Plaintiff's and Class Members' Private Information—and were enriched to the detriment of Plaintiff and Class Members.

232.   As a result of Defendants' wrongful conduct and resulting unjust enrichment, Plaintiff and Class Members are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendants, plus reasonable attorneys' fees and costs.

# VIII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, prays for judgment as follows:

A.    An Order certifying this case as a class action on behalf the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B.    Awarding Plaintiff and the Class damages that include applicable compensatory, actual, statutory, nominal, exemplary, and punitive damages, as allowed by law;

C.    Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

D.    Awarding injunctive relief in the form of additional technical and administrative cybersecurity controls as is necessary to protect the interests of Plaintiff and the Class;

E.    Enjoining Defendants from further deceptive practices and making untrue statements about their data security, the Data Breach, and the transmitted Private Information;

F.    Awarding attorneys' fees and costs, as allowed by law;

G.    Awarding prejudgment and post-judgment interest, as provided by law; and

H.    Awarding such further relief to which Plaintiff and the Class are entitled.

## IX.    DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues to triable.

Dated: October 14, 2025,                Respectfully submitted,

*/s/ Casondra Turner*
Casondra Turner
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
260 Peachtree Street, NW
Suite 2200
Atlanta, GA 30303
Telephone: (866) 252-0878
Fax: (771) 772-3086
cturner@milberg.com

Jeff Ostrow (*pro hac vice* forthcoming)
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
Fax: (954) 525-4300
ostrow@kolawyers.com

*Counsel for Plaintiff and the Putative Class*